## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

MIGUEL A. GARCIA HERRERA and
YESSINIA GARCIA,

        Plaintiffs,

        v.

SHERRILL, INC.,

        Defendant.

Civil Action No. TDC-16-1763

### MEMORANDUM OPINION

Plaintiffs Miguel A. Garcia Herrera and Yessinia Garcia filed suit against Defendant Sherrill, Inc. ("Sherrill") alleging claims of negligence, strict product liability based on a design defect and a failure to warn, breach of express and implied warranties, and loss of consortium. Presently pending before the Court is Sherrill's Motion for Summary Judgment. Having reviewed the filings, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Sherrill's Motion will be DENIED.

### BACKGROUND

Plaintiff Miguel A. Garcia Herrera began working in the tree cutting industry in 2000. From that time until May 31, 2014, the date of the incident that led to this lawsuit, Herrera worked for several companies in that industry and held various roles, from groundman to tree climber to foreman. On the date of the incident, Herrera was working as a tree climber for a tree maintenance and removal business owned by Miguel Alvarado. That day, Herrera was assigned to remove a pine tree at a private residence in Potomac, Maryland. The pine tree was alive but covered in ivy.

Tree climbers typically use a climbing rope and climbing spikes attached to their legs and ankles to ascend a tree. They use the rope to pull themselves higher while inserting their spikes into the tree to push themselves up. Tree climbers also wear hard hats and safety glasses, and they use a second rope, known as a safety line, to secure themselves to the tree while they are working.

While their exact construction varies depending on the brand, climbing spikes are usually attached to a climber's legs with straps that fasten around the ankle and calf, and the straps can be made of leather, Velcro, or a nylon material. On the day of the incident, Herrera was wearing a pair of Gecko Ultra Light Climbing Spikes, which he and a co-worker had jointly purchased online from Sherrill three years earlier in 2011. The Gecko climbing spikes attached to Herrera's legs via a lower strap that fastened around his ankle with a buckle and an upper strap that fastened around his calf with Velcro.

Herrera's plan for taking down the pine tree was to start by removing the tree's lower branches until he got to a point where he could "drop the top," meaning to cut off the top of the tree. Herrera Dep. at 131-133, Mot. Summ. J. Ex. 2, ECF No. 122-4. After cutting off enough lower branches, Herrera began the process of dropping the top. He secured both his climbing rope and safety line around the trunk of the tree about a foot apart and used his chainsaw to begin cutting a notch in the tree. When Herrera tried to reposition his right foot, he felt something get stuck on the Velcro upper strap around his calf which caused it to come undone, and he lost his balance. As he lost control, his chainsaw cut through both his climbing rope and safety line, and he fell approximately 30 feet to the ground. Herrera sustained numerous injuries from the fall, including a dislocation of his hip and leg, fractures to his back, and a permanent spinal cord injury. As a result of these injuries, he now suffers from neurogenic bladder and bowel conditions and severely compromised mobility that prevents him from working.

Plaintiffs commenced this suit against Sherrill on May 31, 2016 and filed an Amended Complaint on January 28, 2021. The Amended Complaint alleges that the design of the Gecko climbing spikes, specifically the use of Velcro to attach them to the upper calf, was a design defect and caused Herrera's injuries. Count I, negligence, alleges that Sherrill negligently designed, manufactured, and sold the Gecko climbing spikes, based on the claims that the use of a Velcro upper strap constituted a design defect, and that Sherrill negligently failed to warn Herrera of the danger posed by that design. Count II, strict product liability based on a design defect, asserts that the climbing spikes were, as a result of the use of a Velcro strap, in a defective condition and unreasonably dangerous in their ordinary and foreseeable use. Count III, strict product liability based on a failure to warn, alleges that Sherrill had a duty to warn Herrera about this defect but failed to do so. Count IV, breach of express and implied warranties, asserts that Sherrill breached both express and implied warranties that the climbing spikes were of merchantable quality, safe for their intended use, and free from dangerous defects. Lastly, Count V, loss of consortium, alleges that Sherrill's actions caused harm to Plaintiff Yessinia Garcia, Herrera's wife, in the form of the loss of her husband's affection, assistance, and fellowship. Plaintiffs seek compensatory and punitive damages.

In discovery, Plaintiffs identified three expert witnesses, consisting of Harold Ehrlich, an engineer with experience in product testing; Mark Webber, a board-certified master arborist; and William Kitzes, a product safety engineer. The details of these witnesses' expert opinions will be discussed below. After discovery, Sherrill filed the pending Motion for Summary Judgment.

## DISCUSSION

In its Motion, Sherrill proceeds in two parts. First, it argues that the expert opinions of all three of Plaintiffs' expert witnesses must be excluded pursuant to Federal Rule of Evidence 702

3

and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Second, Sherrill argues that Plaintiffs have not provided sufficient evidence to prevail on any of their claims, including because expert testimony is necessary to establish a design defect in a product liability case. In opposing the Motion, Plaintiffs argue that their expert opinions are admissible, that even if they are not, expert testimony is not necessary to establish the design defect alleged in this case, and that they have provided sufficient evidence to establish genuine issues of material fact to preclude summary judgment.

## I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court must believe the evidence of the nonmoving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

## II.   Expert Opinions

In seeking summary judgment, Sherrill first argues that the Court should not consider any of the opinions offered by Plaintiffs' three proffered expert witnesses, on the grounds that the

opinions are inadmissible under Federal Rule of Evidence 702.  Rule 702, which governs the admissibility of expert testimony, states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony must establish the admissibility requirements by a preponderance of the evidence.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

In *Daubert*, the United States Supreme Court held that in order for expert testimony to be admissible, it must be both reliable and relevant.  *Daubert*, 509 U.S. at 590-91.  As to the question of reliability, courts consider the factors set forth in Rule 702(b), (c), and (d) and may also consider the following factors: "(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community."  *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 480–81 (4th Cir. 2018) (quoting *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001)); *Daubert*, 509 U.S. at 593-94; *Kumho Tire Co., Ltd.; v. Carmichael*, 526 U.S. 137, 149-50 (1999) (stating that courts may, but are not required to, consider these factors).  These factors are "neither definitive, nor exhaustive" and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue,

5

the expert's particular expertise, and the subject of his testimony." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199–200 (4th Cir. 2001). As noted in *Kumho Tire*, these factors may be, but are not necessarily, relevant when expert opinions are grounded in technical expertise or experience-based expertise, rather than scientific expertise. *See Kumho Tire Co., Ltd.*, 526 U.S. at 150.

Pursuant to Rule 702's requirement that the evidence or testimony "help the trier of fact to understand the evidence or to determine a fact in issue," expert opinions must also be relevant to an issue in the case to be admissible. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").

In applying Rule 702 and assessing the *Daubert* factors, courts must remain "conscious of two guiding, and sometimes competing, principles": "Rule 702 was intended to liberalize the introduction of relevant expert evidence [and] expert witnesses have the potential to be both powerful and quite misleading." *Hickerson*, 882 F.3d at 481. Furthermore, post-*Daubert* decisions have shown "that the rejection of expert testimony is the exception rather than the rule." Fed R. Evid. 702 advisory committee's note to 2000 amendment. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "traditional and appropriate means" of attacking expert testimony that has been admitted by the trial judge. *Daubert*, 509 U.S. at 596.

Under these standards, the Court will address the admissibility of the opinions of each of Plaintiffs' three expert witnesses that are relevant to the resolution of the Motion.

### A.    Harold Ehrlich

Plaintiffs have identified Harold Ehrlich, a practicing engineer, as an expert witness. Ehrlich works at W.O. Thomas and Company, Inc., at which he is engaged in the development of

products and warning and safety instructions, as well as the implementation of improvements in manufacturing environments. He has experience in the fields of industrial engineering, methods engineering, and product safety, design, and manufacturability. Ehrlich is also an associate at Robson Forensic, Inc., an expert witness consulting company at which he conducts technical investigations, drafts reports, and provides testimony for litigation relating to product liability and accidents.

Ehrlich was retained for a specific purpose: "to measure peel strength of a Velcro hook and loop upper strap on a pair of exemplar Gecko Ultra Light Climbing Spikes." Ehrlich Expert Report at 1, Mot. Summ. J. Ex. 16, ECF No. 122-18. As relevant here, peel strength is a measure of the force needed to open a Velcro strap on a climbing spike when it is attached to an individual's leg. To measure the peel strength, Ehrlich used a calibrated Wagner FDX 100 Digital Force Gauge to perform 30 tests, 15 on the right climbing spike and 15 on the left. He manually secured the Velcro strap and then attached the gauge to three different areas of the strap and applied force perpendicular to the plane of adhesion. Ehrlich calculated that the average force required to open the Velcro strap was 6.34 pounds, meaning that this amount of force would need to be applied in the upward direction to support a bag of sugar of the same weight. Ehrlich did not provide an opinion on the design of the climbing spikes or an opinion on liability.

In arguing that Ehrlich's opinion is inadmissible, Sherrill asserts that it is unreliable because the results have no baseline or control, Ehrlich does not point to any relevant scientific literature, and the peer review of his study was limited to that of a colleague at Robson Forensic. Sherrill further asserts that Ehrlich failed to apply the relevant American Society for Testing and Materials ("ASTM") standard or perform a test relating to Velcro straps described in that standard.

Sherrill also claims that Ehrlich's opinion is not relevant because it does not relate to the design of the Gecko climbing spikes.

### 1.    Reliability

Considering the requirements of Rule 702 and *Daubert*, the Court finds that Ehrlich's opinion is sufficiently based on facts and data and is the product of reliable principles and methods reliably applied. Fed. R. Evid. 702. Ehrlich's test to determine peel strength generated specific data, which he documented in his expert report. As for the reliability of his methodology, Ehrlich used a calibrated digital force gauge with a known error rate and applied his training in engineering principles such as the "design of work, including hand and body motions," "Predetermined Time Data to calculate the rate of movement of one performing work," and "the process of 'leveling,' in order to determine if one is working at a normal work rate." Ehrlich Supp. Report at 2, Mot. Summ. J. Ex. 17, ECF No. 122-19. His procedure is well documented in his initial and supplemental expert reports, and as evidenced by his table of recorded measurements, the test is repeatable and produces similar results each time. *Cf. Samuel v. Ford Motor Co.*, 96 F. Supp. 2d 491, 502 (D. Md. 2000) (finding that a test was not reliable because it did not "provide for repeatable, reproducible results, and there are no accepted performance criteria"), *aff'd sub nom. Berger v. Ford Motor Co.*, 95 F. App'x 520 (4th Cir. 2004). Notably, Ehrlich also used a technical data sheet as a control, specifically, a 2018 data sheet created for Sherrill by Taiwan Paiho Limited, which lists peel strength values for Velcro. Using his own methodology, Ehrlich obtained peel strength values consistent with the values in the technical data sheet. Thus, Ehrlich's opinion meets the first *Daubert* factor in that his technique or theory is testable and the third *Daubert* factor in that it had standards and controls and a known or potential rate of error. *Daubert*, 509 U.S. at 593, 594.

As for the second and fourth *Daubert* factors, whether Ehrlich's methodology was subject to peer review and publication, and whether it is generally accepted in the scientific community, Ehrlich's methodology was reviewed only by a colleague at Robson Forensic, and there is no claim that it is generally accepted. However, not every *Daubert* factor, will be relevant to every expert's opinion, and no one factor is dispositive. *Kumho Tire Co., Ltd.*, 526 U.S. at 153 ("Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."); *Nease v. Ford Motor Co.*, 848 F.3d 219, 232 (4th Cir. 2017) ("*Daubert* is a flexible test and no single factor, even testing, is dispositive."). Notably, publication or the lack of publication is relevant but not dispositive in part because some theories "are too particular, too new, or of too limited interest to be published." *Daubert*, 509 U.S. at 593. That is likely the case for a test designed to address the very specific situation of the peel strength of Velcro on climbing spikes as used in the field by tree climbers.

Sherrill takes issue with the fact that Ehrlich failed to perform the specific testing called for under ASTM F887, namely the standard test for measuring peel strength outlined in ASTM D5170. Ehrlich, however, has noted in his supplemental expert report that the ASTM D5170 is a voluntary standard, and there is no requirement that an expert utilize the test it outlines. Ehrlich has also asserted that his test more closely mirrored the factual circumstances of this case because it measured the peel strength of Velcro when removing the strap from a climber's leg, the way that Velcro is used in the field. In contrast, the ASTM test procedure uses a "constant rate extension device" to peel the Velcro apart at rate of 12 inches per minute, which is much slower than Velcro would be peeled apart in the field. Ehrlich Supp. Report at 2. Sherrill's arguments over the most

appropriate test go to weight, not admissibility, and are best raised on cross examination or through the presentation of contrary evidence. *See Daubert*, 509 U.S. at 596.

Although Ehrlich's methodology does not satisfy every *Daubert* factor, those factors are "meant to be helpful, not definitive." *Kumho Tire Co., Ltd.*, 526 U.S. at 151. Because Ehrlich's opinion is grounded in facts and data, his technique can be tested and has a known error rate and a control, and it is tied to the facts of this case, the Court finds this expert opinion is based on reliable principles and methods and has been reliably applied to the circumstances of this case in accordance with Rule 702.

### 2. Relevance

An expert's opinion not only must rest on a reliable foundation, but it also must be relevant to the inquiry at hand. *Daubert*, 509 U.S. at 591; *Nease*, 848 F.3d at 229. "To be relevant, the expert's testimony must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 346 (D. Md. 2011) (quoting *Daubert*, 509 U.S. at 591). Pursuant to this requirement, "the proposed expert testimony must have 'a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" *Nease*, 848 F.3d at 229 (quoting *Daubert*, 509 U.S. at 592). If evidence is not relevant to a fact at issue, it is not admissible. *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021).

Here, Ehrlich's opinion is relevant to a central issue in this case: whether Velcro is a safe and effective means to secure the Gecko climbing spikes to a user's legs. Ehrlich's opinion that only 6.34 pounds of force is required to peel open the Velcro straps will assist the trier of fact in understanding how easily the Velcro can be peeled apart, which in turn is relevant to the question of whether the product was negligently designed. *See Daubert*, 509 U.S. at 591 (stating that

evidence is relevant if it helps "the trier of fact understand the evidence or determine a fact at issue"). Though Ehrlich does not offer an opinion on the design of the climbing spikes, expert testimony may be admissible even if it does not provide an opinion on the central issue in the case. Because Ehrlich's opinion is reliable and relevant, it is admissible under Rule 702.

### B.    Mark Webber

Plaintiffs retained Mark Webber, a board-certified master arborist and certified tree expert, to provide expert opinions on whether the Velcro upper straps on the Gecko climbing spikes were an adequate and secure means of attaching the climbing spikes to a person's legs and whether a buckle fastener provides a safer alternative. Webber is employed by Robson Forensic, Inc., for which he conducts investigations for lawsuits involving trees and plants. At the same time, Webber owns and manages a landscaping company and previously managed tree and landscaping operations for other companies and farms. In this instance, Webber reviewed various documents relevant to this case, including deposition transcripts, exhibits, and the ASTM F887 standard for personal climbing equipment for the years 2010 and 2011. He also performed an experiment of his own design to test if ivy vines of varying diameters could, when inserted into the Velcro straps of the climbing spikes, cause the straps to come apart. Webber found that he could open the straps with the ivy and therefore determined that the Velcro was "easy to compromise by penetration forces of English Ivy." Webber Expert Report at 4, Mot. Summ. J. Ex. 4, ECF No. 122-7. Webber performed the same test on a pair of climbing spikes manufactured by a different company, Buckingham, that attach to a climber's legs via leather straps and a buckle and loop and found that the ivy could not open the leather straps when buckled. Webber asserts three primary opinions: (1) the Velcro wrap on the Gecko climbing spikes is not an adequate and secure means of attachment and therefore rendered the product unreasonably dangerous and defective in a manner

11

that caused Herrera's accident; (2) a safer alternative was feasible and available to Sherrill in the form of a buckle and loop fastener; and (3) Sherrill failed to comply with the standards set forth in ASTM F887 and thereby deprived Herrera of the protection afforded by that standard.

Sherrill seeks the exclusion of Webber's expert testimony on the grounds that (1) Webber's opinions are inadmissible because he is not qualified to provide an opinion on the design of climbing spikes; (2) his opinions are not based on sufficient facts or data and are not the product of reliable principles and methods reliably applied; and (3) Webber's opinion regarding the adhesive qualities of Herrera's climbing spikes is contradicted by physical evidence.

### 1.    Qualifications

A witness's qualifications are "liberally judged by Rule 702." *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). To be qualified as an expert, a witness must have "knowledge, skill, experience, training, or education" on the issue upon which the opinion is offered. Fed. R. Evid. 702; *Kopf*, 993 F.2d at 377. Because an expert who is qualified in one field is not necessarily qualified to offer opinions in a related but different area, "[w]hether a witness is qualified can only be determined by the nature of the opinion he offers." *Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984). Notably, "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion." *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989).

Sherrill argues that Webber is not qualified to offer his expert opinions because he lacks experience in the design of climbing spikes. Sherrill relies on *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378 (D. Md. 2001), in which the court deemed a proffered expert witness unqualified to offer an expert opinion on the safe design and operation of snow throwers. *Id.* at 393-94. Although a mechanical engineer, the witness had no professional experience relating to

the design, manufacture, or operation of outdoor power equipment, including snow throwers, and had no personal experience using a snow thrower except for brief use for purposes of developing his opinion in the case at hand. *Id.* at 393.

However, an expert who plans to testify about a product's defects does not necessarily need to have specific experience in designing the product in question. *See, e.g., Cantrell v. Wirtgen Am., Inc.*, No. CCB-07-2778, 2011 WL 915324, at *3 (D. Md. Mar. 15, 2011); *Ondrushek v. Altec Indus., Inc.*, No. PX-16-3005, 2017 WL 6025407, at *4 (D. Md. Dec. 5, 2017) (stating that the expert's "lack of experience designing lift trucks, while raising concern, does not in and itself compel exclusion"); *cf. Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012) (finding no support for plaintiff's argument "that consumer survey research in trade dress litigation is *sui generis* such that an expert's lack of experience in designing these specific surveys necessarily disqualifies him from giving an expert opinion"). In *Cantrell*, the court found that the plaintiff's expert witness was sufficiently qualified to give an opinion on whether a road milling machine was defectively designed even though he had never designed such a machine, because he was a mechanical engineer with experience designing and performing risk assessments on industrial machines and was familiar with the product at issue through his review of its technical specifications and his inspection of the product itself. *Id.* at *3.

Furthermore, as the Supreme Court has noted, "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co., Ltd.*, 526 U.S. at 150. Experts may draw upon their background and extensive and specialized experience to form an opinion so long as they "explain how [their] experience leads to the conclusion reached, why [their] experience is a sufficient basis for the opinion, and how [their] experience is reliably applied to the facts." *United*

*States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (quoting Fed R. Evid. 702 advisory committee's note to 2000 amendment); *see Morris v. Biomet, Inc.*, 491 F. Supp. 3d 87, 98 (D. Md. 2020).

Here, beyond his general qualifications as an arborist and tree expert, Webber has focused during his work at landscaping companies and farms not only on tree care but also on safety practices and equipment selection and inspections. At his own company, Webber ensures compliance with the ASTM, which provides minimum safety standards for the design and construction of equipment, and the American National Standard Institute ("ANSI"), which provides best practices for arboricultural operations. Significantly, through his work, Webber has gained experience climbing trees with climbing spikes, aerial lifts, and ladders. Webber first climbed a tree in 1980 as part of an arborist class at Ohio State University, and, as he testified at his deposition, he has continued to climb trees as part of his work, has owned three different pairs of climbing spikes, and has used spikes like those at issue in this case "most of my life," Webber Dep. at 19, Mot. Summ. J. Ex. 7, ECF No. 122-9. Finally, for this case, Webber inspected Herrera's climbing spikes, a pair of exemplar Gecko climbing spikes, and a pair of Buckingham climbing spikes with a leather strap and buckle.

The Court must consider Webber's "full range of experience and training" and "not just his professional qualifications" in determining whether he has "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Belk, Inc.*, 679 F.3d at 162. Considered together, Webber's decades-long career in arboriculture, work experience in selecting and inspecting equipment and ensuring compliance with ASTM standards, personal experience using climbing spikes, and inspection of the Gecko climbing spikes in this case, are likely sufficient to qualify him to provide opinions on the design of the Gecko climbing spikes and compliance with ASTM standards.

### 2.    Reliability

#### a.    Adhesive Quality

As an initial matter, Sherrill challenges as inadmissible Webber's opinion, as stated in his deposition testimony, that during his inspection of Herrera's climbing spikes, Webber found that the right Velcro strap did not have "a lot of resistance," that the left Velcro strap had no resistance, and that the exemplar Gecko climbing spikes had much greater adhesive quality.  Webber Dep. at 119.  On this point, Sherrill does not take issue with Webber's methodology but rather asserts that Webber's opinion is wrong because it is contradicted by the analysis of Sherrill's own expert witnesses.  This claim goes to the weight, not the admissibility, of the evidence.  Sherrill then requests that this Court order "Plaintiff to cause the climbers to be brought to Court for an evidentiary hearing to determine whether there is any merit to Webber's testimony sufficient to generate a question of fact."  Mot. Summ. J. at 35, ECF No. 122-2.  Where a motion for summary judgment is evaluated based on the existing record, and evidentiary determinations are typically made after the resolution of such a motion and shortly before trial, the Court need not and will not conduct a hearing such as the one requested by Sherrill before resolving the Motion.  Based on the present record, Sherrill has not demonstrated that Webber's opinion on the adhesive quality of the Velcro straps is unreliable or irrelevant, so the Court can and will consider it in evaluating the Motion for Summary Judgment.

#### b.    Gecko Climbing Spikes Design

The Court considers together Webber's first two opinions in his report, that (1) the Velcro wrap on the Gecko climbing spikes is not an adequate and secure means of attachment and therefore rendered the product unreasonably dangerous and defective in a manner that caused

Herrera's accident; and (2) a safer alternative was feasible and available to Sherrill in the form of a buckle fastener.

The Court finds that Webber's opinion that, for purposes of securing climbing spikes to a user's leg, a buckle fastener is a feasible, safer alternative to Velcro is sufficiently reliable. This opinion was based on Webber's personal experience using climbing spikes, his inspection of Herrera's climbing spikes which showed a loss of adhesion in the Velcro, his review of Ehrlich's test results showing that the Velcro could be peeled open with approximately six pounds of force, and his own tests showing that ivy of the type present at the time of the accident can cause the Velcro to separate but cannot cause a buckle fastener to open. The opinion is therefore based on "facts and data" as required by Rule 702. Fed. R. Evid. 702(b). Although Webber's testing was not based on a methodology generally accepted in the scientific community and has not been subjected to peer review, his analysis was unique to the facts of this case such that the Court would not necessarily expect it to be published or peer reviewed, or for there to be a known error rate. *See Fireman's Fund Ins. Co. v. Tecumseh Products Co.*, 767 F. Supp. 2d 549, 554 (D. Md. 2011). Regardless, Webber described his methodology in his report and ran his test on both Velcro and buckle fastener products, so his test likely can be replicated. Indeed, his design and conduct of a unique test relevant to the specific incident in question is similar to the testing in *Parker v. Allentown, Inc.*, 891 F. Supp. 2d 773 (D. Md. 2012), in which the plaintiff was injured when a rack of animal cages fell on her, and the court accepted the expert testimony of an engineer who conducted a case-specific test to assess the likelihood that the rack would tip over in order to provide an opinion on whether the design of the cages was defective. *Id.* at 786. Particularly where Webber's conclusion is based not only on his own test, but also on the results of Ehrlich's test and his specialized experience using climbing spikes, the Court finds that it is sufficiently

reliable to be admissible. *See Wilson*, 484 F. 3d at 274 (stating that an expert's opinion may be based on the expert's specialized experience).

However, the Court finds that Webber's broader opinions that the Gecko climbing spikes are unreasonably dangerous and defective, and that the defect caused Herrera's accident, are not sufficiently reliable. While the test results and Webber's experience may support the conclusion that a buckle fastener is more secure than Velcro, it does not necessarily follow that Webber may reliably assert the opinion that a Velcro fastener is unreasonably dangerous and defective. Although Webber has designed certain equipment in the past, he is not an engineer, and none of the facts referenced by Webber demonstrate what amount of force applied to the Velcro fasteners would actually be encountered in a work setting for tree climbers and whether such force exceeds the strength of the Velcro. Notably, Webber acknowledged in his deposition that other companies sell climbing spikes with Velcro straps, and that ASTM F887 standards dating back to 2004 have permitted the use of Velcro.

For the same reasons, Webber has not presented sufficient facts to support an expert opinion that Herrera's fall and injuries were caused by the Velcro. Beyond the lack of direct evidence that the forces applied to the Velcro strap during the accident exceeded the peel strength, Webber did not make efforts to address alternative hypotheses on the cause of the accident. *See Casey,* 823 F. Supp. 2d at 334 (noting that an expert offering an opinion on causation "must demonstrate not only that his hypothesis is plausible, but that *it,* and not some alternative hypothesis best explains the event in question" (quoting *Fireman's Fund Ins. Co.*, 767 F. Supp. 2d at 555)).

### c.    ASTM Compliance

Finally, the Court will not exclude Webber's third opinion, that the Gecko climbing spikes did not comply with the ASTM F887, for purposes of deciding the Motion. Sherrill argues that Webber misunderstood the ASTM F887 requirements for sleeve retaining straps and that what Webber "believed was the secondary strap securing the end of the Velcro strap, was in fact the connection between the shank and the cuff." Mot. Summ. J. at 6. In his deposition, while Webber stated that he was initially mistaken about the construction of the sleeve retaining strap, he then maintained that the Gecko climbing spikes do not have the sleeve retaining strap as portrayed in the ASTM F887. He also stated that the climbing spikes were non-compliant because they did not have a minimum wrap length and because they were untested for "bursting strength." Webber Dep. at 207-209. At this stage, without having observed the testimony of Webber or examined the Gecko climbing spikes, the Court cannot conclude that Webber's opinion that the Gecko climbing spikes do not comply with the ASTM F887 was erroneous or unreliable. The Court will therefore consider the opinion in evaluating the Motion.

### C.    William Kitzes

Plaintiffs' third expert witness is William Kitzes, a board-certified product safety manager with experience in safety analysis, regulatory development, and management systems. Kitzes has worked for the United States Consumer Product Safety Commission ("CPSC"), and currently has his own company, Consumer Safety Associates, at which he is the Principal Safety Analyst and Product Safety Manager. Kitzes was retained to review and assess Sherrill's product safety management systems.

To render his opinions, Kitzes reviewed a wide array of documents, including the deposition transcripts of Herrera; Webber; Frederick Wyckoff, the Chief Executive Officer

("CEO") of Sherrill; Tobias Sherrill, the former CEO of Sherrill; Michael Ziecik, the Director of Product Development at Sherrill; and Ulrich Distel, the individual who designed and manufactured the Gecko climbing spikes. He also reviewed Sherrill's website and internal emails, articles on recalls of climbing spikes, articles about Velcro, and the safety policies and manuals of companies and organizations like Walmart and NASA. Kitzes did not inspect the Gecko climbing spikes or perform any testing.

Kitzes's report includes 16 opinions. For purposes of analysis, Kitzes's opinions can be loosely grouped into four general categories: his opinions on Sherrill's product safety management (opinions 1, 2, 3, 4, and 10); his opinions that the use of Velcro straps on the Gecko climbing spikes constituted a design defect (opinions 5, 15, and 16); his opinions on Sherrill's failure to adequately test the Velcro straps (opinions 6, 7, 8, 11, 12, 13, and 14); and his opinion on warning labels (opinion 9). Sherrill's arguments regarding these opinions are at times hard to parse, so to the extent that Sherrill does not explicitly challenge an opinion, the Court will assume without deciding for purposes of the Motion that the opinion is admissible under Rule 702.

### 1.    Opinion 15: Design Defect

In opinion 15, Kitzes states that Velcro alone is an unreasonably dangerous system to protect tree climbers from falls and that the Gecko climbing spikes are defective in the absence of a redundant or secondary close mechanism. Sherrill argues that this opinion and Kitzes's other opinions relating to the safety of Velcro and whether its use in the Gecko climbing spikes constitutes a design defect are not sufficiently reliable because Kitzes performed no testing, relied on no studies or data, and referred only to articles discussing the use of Velcro under "extremely different conditions and applications." Mot. Summ. J. at 36. As discussed above, however, an expert's opinion does not necessarily have to be based on testing; rather, an expert may rely on

specialized experience so long as the expert "explain how [his] experience leads to the conclusion reached, why [his] experience is a sufficient basis for the opinion, and how [his] experience is reliably applied to the facts." *Wilson*, 484 F. 3d at 274 (quoting Fed R. Evid. 702 advisory committee's note to 2000 amendment); *see also Kumho Tire Co., Ltd.*, 526 U.S. at 150 (noting that in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience").

Nevertheless, the Court finds that Kitzes's specialized experience does not provide a reliable basis to support his opinion that the use of Velcro on Gecko climbing spikes constituted a design defect or was unreasonably dangerous. Kitzes's resume shows that he has experience in assessing safety issues relating to different types of products: in his nearly 50-year career he has frequently assessed companies' safety programs, assisted with recalls, developed warning labels, analyzed safety issues and the foreseeable use of products, reviewed advertising and promotional materials, and performed risk analyses. He does not, however, appear to have any meaningful experience relating to Velcro or products using Velcro. He did not inspect Herrera's Gecko climbing spikes and instead only looked at pictures of them, he did not inspect any exemplar Gecko climbing spikes with Velcro straps, and he did not perform any analysis specific to the Gecko climbing spikes. His opinions appear to be based on a review of Herrera's description of his climbing spikes, the statements by Sherrill executives acknowledging certain potential shortcomings of Velcro, and Ehrlich's expert report relating to peel strength. Kitzes also reviewed publicly available general information about Velcro, including that sunlight, heat, and cold can impact the strength of Velcro, that the United States Army has decided to stop using Velcro as the closure for uniform pants pockets because the closure can come open when the pocket is full, and that another brand of climbing spikes, Elderid Talon, had recalled its product due to issues with

Velcro.  Although facts demonstrating some of the drawbacks of Velcro may be considered by a jury in determining whether Velcro is a safe material for use in climbing spikes, Kitzes has not demonstrated that he has conducted relevant tests, or that he has specialized knowledge or experience about the use of climbing spikes and the strength required by the climbing spikes' closure mechanisms, that would permit him to reach a reliable conclusion that the use of Velcro is a defect or unreasonably dangerous. *See Kumho Tire Co.*, 526 U.S. at 156 (stating that the relevant question is "whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case" (citation omitted)).  The Court will therefore not consider opinion 15 in resolving the Motion.

The Court does not, however, find that Kitzes cannot provide opinions on whether Sherrill took steps to identify hazards associated with Velcro or to test the Velcro for safety, as referenced in opinions 5, 8, 12, 13, and 14.  These opinions do not assert that the use of Velcro is a design defect or is unreasonably dangerous and instead relate only to whether Sherrill took reasonable steps to the ensure the safety of its product.

### 2.    Opinions 6-7: ASTM Standards

In opinions 6 and 7, Kitzes states that Sherrill failed to test its climbing spikes for compliance with the ASTM F887 standard but promoted the climbing spikes as meeting the ASTM F887 standard, including on its website, while it was actually unaware whether the climbing spikes so complied, in violation of the Federal Trade Commission Policy on deceptive practices.  Sherrill argues that these opinions should be excluded as not relevant to this case because there is no evidence that the marketing of the Gecko climbing spikes as meeting ASTM standards "caused or contributed" to Herrera's fall and injuries. Mot. Summ. J. at 15.

The ASTM provides consensus standards for the design of products, systems, and materials. While the standards are not mandatory, they are still helpful in evaluating a product's design and determining whether a company has safely manufactured its products. Whether Sherrill evaluated its products under ASTM F887 is therefore relevant, though not dispositive, on the issues of whether Sherrill negligently designed, inspected, and distributed the Gecko climbing spikes and whether Sherrill purposely hid defects in the design of the climbing spikes from users and thus breached any warranties. Although Sherrill makes several factual arguments regarding Kitzes's ASTM opinions, including that Kitzes confused two of its products, and that Sherrill's assertions about ASTM compliance were not actually false, those arguments identify factual disputes that go to weight and are in any event not properly resolved on a motion for summary judgment. Thus, the Court finds that opinions 6 and 7 may be considered in relation to the Motion.

### 3.      Opinion 9: Warning Labels

In opinion 9, Kitzes asserts that Sherrill failed to provide an on-product warning that the Velcro on the Gecko climbing spikes should be replaced every two years, as required to provide reasonable safety. Sherrill argues that this opinion should be excluded as neither reliable nor relevant. First, Sherrill asserts that the opinion is not reliable based on *Ruggiero v. Yamaha Motor Corp., U.S.A.*, No. CV 15-49 (JBS/KMW), 2017 WL 1197755, at *5-10 (D.N.J. Mar. 31, 2017), *aff'd*, 778 F. App'x 88 (3d Cir. 2019), in which the district court excluded expert testimony by Kitzes himself that an additional third warning label on a jet ski needed to be placed on the seat in front of the passenger because the warning label on the "aft portion beneath the seat may not be noticed by a passenger who mounts the [jet ski] from the side." *Id.* at *7. Although the court found that Kitzes was qualified to testify as an expert on warning labels, his opinion was deemed inadmissible because he had performed no testing related to the warning placement, such as focus

22

groups, and did not rely on any known standard that supported placement in one location rather than another, other than the general ANSI Z535 standard for safety information in product manuals, instructions, and other materials, which provides that "[p]roduct safety signs and labels shall be placed such that they will: (1) be readily visible to the intended viewer and (2) alert the viewer to the potential hazard in time to take appropriate action." *Ruggiero*, 20117 WL 1197755, at *6 (citing ANSI Z535.4 Standard for Product Safety Signs and Labels § 9.1). Unlike in *Ruggiero*, however, Kitzes's opinion here is not about a particular location on the product, but whether a warning needed to be placed somewhere on the product, rather than only on the paperwork that came with the product when it was sold. On this issue, Kitzes's opinion is based not only on his extensive experience advising companies on appropriate warnings, but also on the ANSI Z535 standard. Thus, Kitzes's opinion explaining that a warning on the strap itself would meet this standard, while a warning on a piece of paper that came with the product would not do so because it would not be accessible to the product user at the time of use, is based on his specialized knowledge of the ANSI standard and is reliably grounded in its application.

As for whether the opinion is relevant, Sherrill has acknowledged that it would be "important" to have a warning label regarding the need to replace Velcro straps every two years and that it should be on the actual product itself. Sherrill Dep. at 52, Mot. Summ. J. Ex. 18, ECF No. 122-30. The product was three years old at the time of the incident, there is no evidence that the Velcro was replaced, and although there is a factual dispute about the condition of the Velcro at the time of the incident, Webber has testified that upon inspection, the right strap lacked significant resistance. Further, Herrera stated in his deposition that had there been a warning on the climbing spikes that the Velcro was not strong enough under all circumstances to keep from

23

coming undone, he would not have used the climbing spikes. The Court therefore will not exclude this opinion.

### 4.    Remaining Opinions

Sherrill does not appear to challenge the reliability or relevance of Kitzes's opinions 1, 2, 3, 4, 8, 10, 11, 12, 13, or 14, so the Court will assume without deciding for purposes of the Motion that these opinions are admissible under Rule 702.

## III.   Summary Judgment

In arguing that summary judgment should be granted, Sherrill asserts that its Motion addresses only two issues, which are relevant to all counts: whether there is sufficient evidence to show (1) that the Gecko climbing spikes had a design defect based on the use of Velcro on the upper straps; and (2) that the defect caused or contributed to Herrera's injury. Sherrill's primary argument is that all of Plaintiffs' expert testimony is inadmissible, and that without such evidence, they cannot show a design defect. This categorical argument fails for two reasons. First, as discussed above, the Court is not excluding all of Plaintiffs' expert testimony. Second, although expert evidence may be necessary in some products liability cases, it is not required where jurors can understand and are aware of the issues "as a matter of general knowledge." *Babylon v. Scruton,* 138 A.2d 375, 379 (Md. 1958); *see also Schmitz-Werke Gmbh + Co. v. Rockland Indus., Inc.,* 37 F. App'x 687, 692 n.5 (4th Cir. 2002) ("Expert testimony is not required on matters of which the jurors would be aware by virtue of common knowledge."); *Shreve,* 166 F. Supp. 2d at 410 ("It is not the rule that expert evidence must be presented to prove the existence of a defect."). "[E]xpert testimony is only required when the subject of the inference is so particularly related to some science or profession that it is beyond the ken of the average layman." *Virgil v. Kash N' Karry Serv. Corp.,* 484 A.2d 652, 656 (Md. Ct. Spec. App. 1984); *Shreve,* 166 F. Supp. 2d at 410 (citing

*Virgil*). In particular, for a design defect claim, when the claim involves "uncomplicated products or simple design features, the question of the practicability of a proposed design change" can be evaluated "on the basis of inference and common knowledge of the jury." *Johnson v. Int'l Harvester Co.*, 702 F.2d 492, 496 (4th Cir. 1983); *Shreve*, 166 F. Supp. 2d at 415 (citing *Johnson* but concluding that the design in question relating to the operation of a snow thrower was not uncomplicated or simple and therefore required expert testimony).

Here, the design of the Velcro straps on the Gecko climbing spikes, while having some technical aspects, is not beyond the understanding of the average person. Velcro is a material with which most if not every juror will be familiar and have experience, and the issue of whether it provides a safe means of securing the Gecko climbing spikes is not so intertwined with science that it cannot be understood and evaluated by a juror without the aid of expert testimony. The Court therefore declines to grant summary judgment based solely on the purported lack of expert testimony.

## A.    Design Defect

Under Maryland law, to establish a design defect in support of a products liability claim under either a strict liability or negligence theory, a plaintiff must provide sufficient evidence to establish: (1) the existence of a defect; (2) the attribution of the defect to the seller; and (3) a causal relation between the defect and the injury. *Ford Motor Co. v. Gen. Accident Ins. Co.*, 779 A.2d 362, 369 (Md. 2001); *Jensen v. Am. Motors Corp., Inc.*, 437 A.2d 242, 247 (Md. Ct. Spec. App. 1981).

A product is defective in design "when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller . . . and the omission of the alternative design renders the product not reasonably safe." *Halliday*

*v. Sturm, Ruger & Co., Inc.*, 792 A.2d 1145, 1150 (Md. 2002) (quoting Restatement (Third) of

Torts: Prod. Liab. § 2 (Am. Law Inst. 1998)).  In a design defect case, the issue is therefore whether

a manufacturer, "knowing the risks inherent in his product, acted reasonably in putting it on the

market." *Singleton v. Int'l Harvester Co.*, 685 F.2d 112, 115 (4th Cir. 1981) (applying Maryland

law).  While there are some cases in which the design creates "inherently unreasonable risks," in

cases outside of this limited category, the court must conduct an analysis to determine whether the

design is defective and not reasonably safe. *Id.*  In cases where a product fails or malfunctions in

some way, Maryland courts generally apply a risk-utility test to assess whether a design is defective

and renders a product unreasonably dangerous. *Kelley v. R.G. Indus., Inc.*, 497 A.2d 1143, 1149

(Md. 1985).  Application of this test requires an analysis of the following factors:  (1) the

usefulness and desirability of the product; (2) the availability of other safer products to meet the

same need; (3) the likelihood of injury and its probable seriousness; (4) the obviousness of the

danger; (5) the user's anticipated awareness of the dangers in the product based on general public

knowledge of the product or the existence of suitable warnings or instructions; (6) the ability to

avoid injury by care in use of the product; and (7) the ability to eliminate the danger without

seriously impairing the usefulness of the product or making it unduly expensive.  *Johnson,*702

F.2d at 494-95 (applying Maryland law); *Singleton*, 685 F.2d at 115; *Klein v. Sears, Roebuck &*

*Co.*, 608 A.2d 1276, 1280-81 (Md. Ct. Spec. App. 1992); *see also Phipps v. Gen. Motors Corp.*,

363 A.2d 955, 959 n.4 (Md. 1976).

Considering the record evidence, the Court finds that there are, at a minimum, genuine

disputes of material fact that preclude summary judgment on this issue at this time.  The product

is generally useful to the tree-climbing industry in that it allows workers to ascend trees and to

remain at an elevated level to conduct work on the trees.  From the testimony of Ehrlich and

Webber, there is evidence that the use of a buckle fastener on the upper calf strap rather than Velcro is a safer alternative, including Ehrlich's test showing that only approximately six pounds of force can open the Velcro, Webber's testimony about his experience using climbing spikes, and Webber's test showing that ivy can impact the ability of Velcro to remain closed, as compared to the results showing that ivy cannot open the buckle fastener. Moreover, as noted by Kitzes, the U.S. military has discontinued the use of Velcro on certain parts of uniforms because the Velcro can accumulate dirt and sand and can open when there is significant pressure on the closure, such as on a pocket full of material.

Significantly, the evidence is not limited to Plaintiffs' expert testimony. Statements from Sherrill executives support the conclusion that Velcro is less safe than a buckle fastener. For example, on September 12, 2013, Michael Ziecik, Sherrill's Director of Product Development, wrote to Ulrich Distel, the German manufacturer of the Gecko climbing spikes: "Velcro seems risky, in my humble opinion, due to the high probability of debris contamination particularly sawdust which could lower the actual Velcro bond strength. We could definitely test some concepts out, no harm in trying. My other concern would be the climbers feel the same security with Velcro as they would with belted straps." 9/12/13 Email, Opp'n Mot. Summ. J. Ex N, ECF No. 123-17. On another occasion, in a September 26, 2007 email to Distel, former Sherrill CEO Tobias Sherrill wrote: "I suspect that the Velcro bottom strap will receive a lot of abuse and without extensive historical use am not keen on risking it." 9/26/07 Email, Opp'n Mot. Summ. J. Ex. O, ECF No. 123-18. On October 11, 2012, Distel wrote to Ziecik that he and Sherrill had previously, "agreed that the Velcro straps are prone to make problems in the handling," because American consumers do not always handle the product appropriately, and concluded that the product would not use Velcro on the lower straps. 10/11/12 Email, Opp'n Mot. Summ. J. Ex. P,

ECF No. 123-19. In his deposition, Sherrill acknowledged that the Velcro straps need to be replaced every two years because of wear.

As for the ability to eliminate danger without seriously impairing the usefulness of the product or making it unduly expensive, the fact that other competing products such as the Buckingham climbing spikes use buckle fasteners, and Sherrill's admission that Velcro is more expensive than buckle fasteners, demonstrate that these factors weigh in favor of a finding of a design defect.

On the other factors in the risk-utility test, there is no evidence in the record of similar injuries, so the likelihood of injury is not particularly high. The probable seriousness of injury, however, is very high in light of the undisputed catastrophic injuries to Herrera and the broader fact that climbing spikes are used by workers who, like Herrera, climb and work at extreme heights. The evidence is limited on how obvious the danger of using Velcro is in this setting and the general public knowledge of the product. Although Herrera testified that he understood that he could be in danger if the climbing spikes were in bad condition, and that the tree covered in ivy presented a danger of entanglement, he did not perceive his climbing spikes to be in poor condition on the day of the incident. Recognizing some potential danger, Sherrill includes a warning in the product instructions that the Velcro must be changed every two years, but it does not provide a warning on the product itself, and Kitzes has testified that under the ANSI Z535 standard for safety information in product manuals, instructions, and other materials, this type of warning should be placed on the product itself so the warning is seen when the product is used. Viewed in the light most favorable to the nonmoving party, there is evidence that the potential danger of the Velcro failing was not obvious to the user or addressed by suitable warnings.

When the factors are considered together, the Court finds that there is, at a minimum, a genuine issue of material fact on whether the use of Velcro was not reasonably safe and therefore constituted a design defect. In particular, the evidence that Velcro is not as strong a fastener as a buckle fastener, the availability of another fastener mechanism that is already in widespread use and is not more expensive, and the catastrophic consequences of a failure of the Velcro support this determination.

Sherrill's arguments to the contrary do not alter this conclusion. Although Sherrill focuses on the lack of any prior documented accidents similar to Herrera's incident, this fact is not dispositive. Courts have found sufficient evidence of a design defect in similar scenarios to the present one, where a product had not previously failed and caused the type of serious injury in question, but the potential for injury was foreseeable and an alternative design was available but not used. In *Johnson v. International Harvester Co.*, 702 F.2d 492 (4th Cir. 1983), the plaintiff was severely injured after he accidentally moved the transmission gear lever into the forward position as he slipped and fell exiting a tractor, and the tractor then rolled forward over his body. *Id.* at 494. The court held that there was sufficient evidence to support a finding of a design defect based on evidence that the lever was placed at a location that protruded into the opening of the tractor used to get in and out of the operator's seat, that the tractor could move forward without the use of the clutch, that the design did not comport with the standards of the Society of Automobile Engineers and the American Society of Agricultural Engineers, and that there were available alternative designs that would have avoided the problem at no or limited additional cost. *Id.* at 495-96. The court reached this conclusion even without evidence that others had been injured because of the lever location. *See id.*

Likewise, in *Parker v. Allentown, Inc.*, 891 F. Supp. 2d 773 (D. Md. 2012), the court denied summary judgment on a design defect claim where the plaintiff suffered a broken leg after a rack of animal cages fell on her as she was pulling out cages from one of the top rows of the rack, even in the absence of any reports of similar injuries caused by the 20,000 racks sold. *Id.* at 777, 792. The court reached this conclusion based in part on a citation from the Maryland Occupational Safety and Health, a state agency, stating that the rack did not have an adequate base to height ratio and on evidence that the danger could have been averted by a relatively inexpensive mechanism for securing the rack to the wall or by a design that had a wider base and a "less high rack." *Id.* at 792. As these cases illustrate, the lack of prior similar accidents does not prevent a finding of a design defect.

Although Sherrill also argues that the use of Velcro is permitted by the ASTM standards, and in *Johnson* and *Parker* the evidence in support of a defect included a lack of compliance with either regulatory or industry standards, in the present case there remains a genuine dispute of material fact on whether the Gecko climbing spikes complied with all aspects of the ASTM standards. *See supra* part II.B.2.c. Even if the climbing spikes did comply, that fact would be relevant but not dispositive, as there is no requirement that a plaintiff show a violation of particular governmental or industry standards to prevail on a design defect claim. *See Alevromagiros v. Hechinger Co.*, 993 F.2d 417, 420 (4th Cir. 1993) ("In determining what constitutes an unreasonably dangerous defect, a court will consider safety standards promulgated by the government or the relevant industry, as well as the reasonable expectations of consumers.") (applying Virginia law); *see also Torkie-Tork v. Wyeth*, 739 F. Supp. 2d 895, 899 (E.D. Va. 2010) (citing *Alevromagiros* and stating that a court may consider relevant safety or industry standards, but such evidence is "not conclusive in determining what constitutes an unreasonably dangerous

defect"); *cf. Moran v. Faberge, Inc.*, 332 A.2d 11, 20 n.10 (Md. 1975) (noting that while a trier of fact may consider the prior history of the product and the manufacturer's adherence to industry standards and practices in analyzing a failure-to-warn claim, these factors are not dispositive).  The Court therefore declines to grant summary judgment on the issue of design defect.

### B.   Causation

Sherrill's second argument in favor of summary judgment is that there is insufficient evidence to show that the design defect caused or contributed to Herrera's injuries.  In his deposition, Herrera testified that the Velcro calf strap came undone and he lost his balance, which triggered the sequence of events that caused him to fall approximately 30 feet to the ground.  He stated:

> I was cutting when I move my foot, like I say, I felt something go stuck, but I was looking at the chainsaw. But I had no control. I had no balance. I lose control, and you have – you know how the chainsaw is. It hit the first rope, and then when I cut the rope, I thought I still have the safety line, and I know something happen. I look what happen. My Velcro was off, but it was too late. My – also my safety line was cut. My chainsaw touch the safety line, and, you know how the safety line is make. So I saw when the safety line was coming – was breaking apart, and I start screaming. The safety line got completely break. I look for any branches what I can grab. I came down, and hit the ground ....

Herrera Dep. at 145-146.

Thus, there is direct evidence that a failure of the Velcro strap had a causal relationship with Herrera's fall.  Even in the absence of an expert opinion relating to causation, a reasonable jury could evaluate Herrera's testimony and conclude that the failure of the Velcro to hold caused his injuries.  When combined with Ehrlich's testimony about the limited force needed to undo the Velcro, and Webber's testimony that ivy can potentially cause the Velcro to open and his observation that the resistance or adhesion of the right Velcro strap was reduced when he inspected the climbing spikes after the incident, there is sufficient evidence to support a finding of causation.

The record contains contrary evidence identified by Sherrill, including Herrera's statement in his deposition that his climbing spikes "were looking good" on the day of his accident, *id.* at 249-50, and expert testimony that the Velcro was in good condition following the accident. Sherrill has also offered expert testimony from Donald Blair, an arborist and certified tree safety professional, in which he theorizes that other factors may have caused or contributed to the injury, including Herrera's failure to maintain enough separation between his climbing line and safety line, which allowed both to be accidentally cut in quick succession, and Herrera's failure to stop work and turn off his chainsaw the moment he felt something tug at the Velcro on his climbing spikes. Such evidence, at most, creates a genuine issue of material fact on the issue of causation. *See Parker*, 891 F. Supp. 2d at 789 (finding that whether the instability of the rack of animal cages caused the plaintiff's injury, as opposed to the plaintiff's own actions, was a disputed issue to be determined by a jury). The Court therefore declines to grant summary judgment based on a lack of evidence of causation.

## C.     Punitive Damages

Sherrill also seeks summary judgment on the issue of punitive damages. Courts may award punitive damages where a plaintiff has established, by clear and convincing evidence, that the defendant acted with "actual malice," meaning that the "the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud." *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 652 (Md. 1992); *Caldor, Inc. v. Bowden*, 625 A.2d 959, 973 (Md. 1993) (holding that for punitive damages to be awarded, the tort must be committed with malice). "[I]n order for actual malice to be found in a products liability case, regardless of whether the cause of action for compensatory damages is based on negligence or strict liability, the plaintiff must prove (1) actual knowledge of

32

the defect on the part of the defendant, and (2) the defendant's conscious or deliberate disregard of the foreseeable harm resulting from the defect." *Owens-Illinois, Inc.*, 601 A.2d at 653.

Sherrill primarily argues that there can be no punitive damages because there was no design defect. That argument fails because the Court finds a genuine dispute of material fact on that issue. Sherrill further asserts that even if there were a design defect, it had no knowledge of such a defect, nor did it act with conscious or deliberate disregard of a foreseeable harm, particularly where other companies sell similar products and Velcro straps are permitted by ASTM F887.

Although the fact that Velcro is permitted by the ASTM is a key fact in favor of Sherrill, the record also contains evidence favorable to Plaintiffs on this issue. As discussed above, in October 2012, Distel, the manufacturer of the Gecko climbing spikes, wrote in an email to Ziecik that he had previously discussed with Sherrill the use of lower Velcro straps on the Gecko climbing spikes and agreed that "Velcro straps are prone to make problems in the handling" because "users have to handle the climbers with care and not all are willing and able to do so," particularly American customers, to which Ziecik responded, "You are correct. Velcro most likely will be a problem." 10/11/12 Email. Then, on September 12, 2013, Ziecik stated in an email that he considered Velcro "risky" because there is a "high probability of debris contamination particularly sawdust which could lower the actual Velcro bond strength." 9/12/13 Email. Ziecik acknowledged in his deposition that if the upper Velcro strap came undone, it would pose a risk of serious injury or death. Sherrill was also aware that another brand of climbing spikes which used Velcro, Elderid Talon, had recalled climbing spikes, and Sherrill had received a report of a problem with the end of a Velcro strap on that product coming loose. As noted by Kitzes, Sherrill did not conduct any tests on the Gecko climbing spikes, including any tests to ensure the climbing spikes met the ASTM F887. The record therefore contains facts demonstrating sufficient

knowledge of the problems with Velcro to support the conclusion that Sherrill acted with conscious or deliberate disregard of a foreseeable harm.

Where the issue of actual malice is a question of fact, the Court finds that there remain genuine issues of material fact on whether Sherrill had knowledge of or acted with conscious disregard of a foreseeable harm and will deny summary judgment on this issue. *See Owens-Illinois, Inc.*, 601 A.2d at 652 (stating that the trier of fact determines whether plaintiff has established the elements necessary to award punitive damages).

## CONCLUSION

For the foregoing reasons, Sherrill's Motion for Summary Judgment, ECF No. 122, will be DENIED.  A separate Order shall issue.

Date:  February 27, 2023

THEODORE D. CHUANG
United States District Judge